**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION**

| | |
|---|---|
| COLLISION COMMUNICATIONS, INC., <br><br> Plaintiff, <br><br> v. <br><br> APPLE INC., <br><br> Defendant. | Case No. 7:26-cv-00273 <br><br> **JURY TRIAL DEMANDED** |

**PLAINTIFF COLLISION COMMUNICATIONS, INC.'S
COMPLAINT FOR PATENT INFRINGEMENT**

Collision Communications, Inc. brings this action for patent infringement under 35 U.S.C. § 271 against Defendant Apple Inc. ("Apple" or "Defendant") and alleges as follows:

**PARTIES**

1. Plaintiff Collision Communications, Inc. ("Collision" or "Plaintiff") is a Delaware corporation with its principal place of business at 20 Depot St., Suite 2A, Peterborough, New Hampshire 03458. Collision was formed in 2011 and is a telecommunications research and development company that creates and implements proprietary methods for reducing signal interference in networks.

2. On information and belief, Apple Inc. ("Apple" or "Defendant") is organized and existing under the laws of California, and is registered to do business in Texas. Apple has a significant presence in Texas and has maintained a regular and established place of business with offices and/or other facilities in this District at least at 12545 Riata Vista Circle, Austin, TX 78727; 6900 W Parmer Lane, Austin, TX 78729; 320 S. Capital of Texas Hwy, West Lake Hills, TX 78746; 7400 San Pedro Avenue, San Antonio, TX 78216; 3121 Palm Way, Austin, TX 78758; 15900 La Cantera Parkway, San Antonio, TX 78256; 8401 Gateway Boulevard West, El Paso, TX

79925; and 2901 S. Capital of Texas Hwy, Austin, TX, 78746.

3.      Apple Inc. may be served through its registered agent for service of process, CT Corporation, 1999 Bryan St., Suite 900, Dallas, Texas, 75201-3136.

## JURISDICTION AND VENUE

4.      This action arises under the Patent Act, 35 U.S.C. § 1 *et seq*.

5.      Subject matter jurisdiction is proper in this Court under 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over Defendant because Defendant has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the forum as a result of business conducted within the State of Texas and the Western District of Texas. Personal jurisdiction also exists over Defendant because, directly or through subsidiaries, Apple makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products within the State of Texas and the Western District of Texas that infringe one or more claims Asserted Patents.  Further, on information and belief, Defendant has placed or contributed to placing infringing products into the stream of commerce knowing or understanding that such products would be sold and used in the United States, including in this District.

7.      On information and belief, Defendant also has derived substantial revenue from infringing acts in the Western District of Texas, including from the sale and use of infringing products.

8.      Venue in this District is proper under 28 U.S.C. § 1391(c)(3) and 28 U.S.C. § 1400(b).  Apple maintains regular and established places of business in this judicial district, and has committed acts of infringement in this district.

**THE ASSERTED PATENTS**

9. Collision is the sole owner of, and possesses all rights, interests, and title of U.S. Patents 7,092,464 (the '464 patent), 7,110,439 (the '439 patent), 7,218,665 (the '665 patent), and 9,635,190 (the '190 patent) (collectively, the "Asserted Patents"). These patents are attached as **Exhibits A–D**, respectively. Each patent is valid and enforceable.

10. The first three Asserted Patents stem from work at BAE Systems ("BAE"). BAE is a multinational defense, security, and aerospace company which develops solutions for the U.S. Armed Forces. At the time of the inventions at issue in this case, BAE was working on multi-user detection techniques to address the problem of interference in then-existing and future communications technology. Multi-user detection allows a system to mitigate or encourage interference between multiple signals in the system, and uses advanced techniques to either cancel out the interfering signals or separately receive multiple interfering signals simultaneously.

11. The BAE Asserted Patents address various techniques for improving the way communications systems deal with interference.

12. The '464 patent is titled "Multiuser Detection With Targeted Error Correction Coding." The claims are drawn to methods for reducing error correction coding complexity by reusing prior confidence values for a given user when subsequent confidence values do not meet a threshold. *See generally* '464 patent, claim 1. The '464 patent explains that then-existing MUD techniques were often too complex, especially in highly loaded systems, to operate at acceptable performance levels in real time; and that in particular, existing techniques did not account for the high complexity of error correction decoding. *Id.* 2:27–42. The inventor thus proposed a system wherein a receiver can use existing confidence values for a given user if redundant confidence values do not meaningfully change, avoiding the need for additional error correction decoding for that particular user, and reducing overall complexity. *Id.* 2:46–64. As a result, "[c]omputational

complexity normally associated with decoding in various MUD solutions is therefore reduced without causing degradation in quality of service or decreasing the total throughput." *Id.* 12:30–33. And the claim limitations themselves are unconventional, considered both individually and as an ordered combination.

13. The '439 patent is titled "System for Decreasing Processing Time in an Iterative Multi-User Detection System." Addressing a similar problem in the art as the '464, the '439 patent claims reduce complexity in MUD systems by, generally speaking, providing bit value estimates for multiple signals in a multiuser detector, considering some of those estimates certain based on a threshold, and eliminating from subsequent iterations any bit estimates that exceed the threshold. *See generally* '439 patent, claim 1. As the patent explains, "[t]he result [of techniques like those claimed in the patent] is that the final bit estimates are more quickly ascertained, which results in dramatically reduced processing times. Thus the original incoming interfering signals are recovered quicker with fewer iterations and less computation." *Id.* 5:52–56. The limitations themselves are unconventional, considered both individually and as an ordered combination.

14. The '665 patent, titled "Deferred Decorrelating Decision-feedback Detector for Supersaturated Communications," is generally directed to addressing problems associated with the high computational complexity of many multi-user detection techniques, especially in supersaturated environments or computationally restricted wireless handsets. Existing systems were not able to keep up with real-time transmissions or had poor quality output when there were many users or too much interference. *See, e.g.*, '665 patent at 7:25–34. The inventions of the '665 patent address these problems and improve multiuser telecommunications techniques by using a unique combination of parameter estimation, filtering/whitening, and decision tree-based hypothesis test-

ing. *Id.* at 9:5–9. As a result, the inventions are "an improvement on a multiuser detection processing procedure that allows for real time implementation in receivers designed for typical and high data rate multiple access communication, without causing degradation in quality of service or decreasing the total throughput." *Id.* at 10:24–29. The '665 claim limitations are also unconventional, considered both individually and as an ordered combination.

15. After acquiring BAE's patents in 2011, including the Asserted Patents above, Collision's engineers began developing a software solution that could take advantage of and improve on BAE's research in modern cellular networks and wireless devices. Those engineers included Joe Farkas and Brandon Hombs, two former BAE engineers, and Barry West, Collision's original CEO and the former CTO of Sprint. Over several years of development of their software solution based on BAE's pioneering research, Collision's engineers also pioneered their own novel solutions to problems they saw in the wireless systems they were working on. One such solution resulted in the '190 patent.

16. The '190 patent is titled "Methods, Systems, and Computer Program Products for Communicating Data Selectively Via Heterogeneous Communication Network Links." Just as BAE's work on MUD sought to optimize a device's use of the available resources in a given wireless network, the inventors of the '190 patent sought to optimize a device's use of the multiple wireless network links accessible by the device.

17. The '190 specification explains that modern wireless devices have multiple different network links (e.g., Wi-Fi, cellular, Bluetooth, etc.) available to them for communication of data, but that conventional approaches to choosing between these various links were limited to relying on information local to the device. '190 patent 1:9–44. The inventors thus devised an

improvement to conventional link selection techniques that leverages additional information obtained from the network. *Id.* 6:1–23. "Knowledge of the network conditions can provide better optimizations for the user device and also provides for network level precautions that protect the network itself." *Id.* 6:4–6. The claims are drawn, for example, to methods for communicating data selectively via heterogeneous communication links based on data cost information received from a Network Link Selector via the network. *See, e.g.*, *id.* claim 14. The limitations recited in the claims are unconventional when considered alone or in an ordered combination.

## THE PARTIES' HISTORY

18.     Collision was created in 2011 with the goal of developing software products that could bring BAE's groundbreaking communications technology to the broader commercial market in which BAE did not traditionally operate.

19.     Collision began its business by developing advanced simulation environments to emulate real world cellular networks and showcase the massive gains Collision's software techniques could provide to interference-laden wireless networks. Collision's goal was to collaborate with existing cellular hardware manufacturers to bring Collision's advanced software solutions to their products.

20.     Collision believed that the ever-increasing congestion in cellular and Wi-Fi networks, as well as the emergence of techniques like MIMO to employ simultaneous/overlapping data streams, meant that Collision's advanced interference technology would become invaluable to both base station and handset manufacturers in the coming years.

21.     Collision initially targeted base station manufacturers like Samsung, Nokia, and Ericsson as potential early adopters of Collision's technology, and pursued lengthy collaboration efforts with both Samsung and Nokia, which lasted until 2019.

6

22.    But Collision always knew that its technology would be useful in end user devices like cell phones, tablets, and computers; and especially in mobile devices, since the low complexity of Collision's techniques relative to other alternatives made them well suited for devices with computational and power constraints.

23.    Thus, Collision reached out to Apple as early as 2015 to introduce the Collision portfolio to Apple.

24.    Collision's founder, Mr. Stan Fry, had a lengthy history with Apple, and over the ensuring years Collision had extensive discussions with Apple about the Collision portfolio.

25.    Collision provided patent lists, explanations of the relevant technology and likely use cases for it, and detailed explanations of potential infringements or the types of features that would infringe Collision's patents.

26.    Apple never took a license to Collision's patent portfolio.

27.    Based on the parties' lengthy history, Apple received actual notice of the Asserted Patents and its infringement of them, or obtained information sufficient that it should have known of or was willfully blinding itself to its infringement.

<b><u>ALLEGATIONS OF PATENT INFRINGEMENT</u></b>

**A.    The Accused Products**

28.    On information and belief, Apple makes, uses, sells, offers for sale, and/or imports, in/into the United States, products that implement and practice Collision's proprietary wireless technologies.  On information and belief, Apple products sold in the damages period that provide 4G, 5G, or Wi-Fi connectivity infringe at least one claim of one or more of the Asserted Patents and comprise the "Accused Products" in this case.[1]

---

[1] The Accused Products include all configuration, colors, sizes, and variations.

29. Exemplary Accused Products include, but are not limited to:

- iPhone 17/ 17 Air / 17 Pro /17 Pro Max

- iPhone 16 / 16e / 16 Pro / 16 Pro Max / 16 Plus

- iPhone 15 / 15 Pro / 15 Pro Max / 15 Plus

- iPhone 14 / 14 Pro / 14 Pro Max / 14 Plus

- iPhone 13 / 13 Pro / 13 Pro Max / 13 mini

- iPhone 12 / 12 Pro / 12 Pro Max / 12 mini

- iPhone 11 / 11 Pro / 11 Pro Max

- iPhone X / XS / XS Max / XR

- iPhone SE (3rd gen, 2022)

- iPhone SE (2nd gen, 2020)

- iPad (all generations sold in damages period)

- iPad Mini (all generations sold in damages period)

- iPad Air (all generations sold in damages period)

- iPad Pro (all generations sold in damages period)

- Apple Watch (all generations sold in damages period)

- MacBook Air (all generations sold in damages period)

- MacBook Pro (all generations sold in damages period)

- Mac Mini (all generations sold in damages in damages period)

- iMac (all generations sold in damages in damages period)

- Mac Pro (all generations sold in damages in damages period)

- Mac Studio (all generations sold in damages period)

30.     The exemplary products listed in this complaint are non-exhaustive and non-limiting.  Collision's allegations include all Apple products with the accused features that have infringed spanning the entire damages period of this case, as well as similar versions that continue to be released in the future.

**B.      Acts of Patent Infringement**

31.     Collision incorporates by reference the preceding paragraphs as if fully set forth herein.

32.     As set forth below, Apple's Accused Products incorporate, without any license from Collision, the 4G, 5G, and Wi-Fi technology protected by Collision's Asserted Patents.

33.     Apple, directly or by controlling the activities of its subsidiaries, has directly infringed, and continues to directly infringe, the Asserted Patents under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or importing into this District and elsewhere in the United States, one or more of its Accused Products.

34.     For example, Apple sells, and offers for sale infringing devices to its customers, subsidiaries, distributors, retailers, partners, cell-service providers, and/or end users in the United States.

35.     On information and belief, Apple engages in the designing, developing, and manufacturing of the Accused Products sold, used, and offered for sale in the United States. On information and belief, Apple is involved in sales of the Accused Products, as well as the after sales and corporate functions pertaining to the Accused Products.

36.     Apple has indirectly infringed the Asserted Patents under 35 U.S.C. § 271(b) by actively inducing infringement by others, such as its subsidiaries, distributors, retailers, partners,

9

cell-service providers, and end-user customers, by, for example, implementing the infringing features in its cellular and Wi-Fi products, encouraging its users to take advantage of those features within the United States. Because Apple performed these acts with full knowledge of the Asserted Patents and their infringement thereof, it has specifically intended others, including its subsidiaries, distributors, retailers, partners, cell-service providers, and end-user customers to infringe the Asserted Patents knowing its subsidiaries, distributors, retailers, partners, cell-service providers, and end-user customers' acts constitute infringement.

37.     For example, Apple's advertising, sales, and/or technical materials related to the Accused Products contained and continue to contain instructions, directions, suggestions, and/or invitations that invite, entice, lead on, influence, encourage, prevail on, move by persuasion, and/or cause its subsidiaries, distributors, retailers, partners, cell-service providers, and end-user customers to directly infringe at least one claim of each of the Asserted Patents, either literally or under the doctrine of equivalents. Apple's activities also encourage Apple's subsidiaries, distributors, retailers, partners, cell-service providers, and end-user customers to use features that infringe Collision's Asserted Patents, including the 4G, 5G, and Wi-Fi capabilities of the Accused Products.

38.     On information and belief, Apple has provided technical documentation and training materials to its subsidiaries, distributors, retailers, partners, cell-service providers, and end-user customers, and the public that cause end users of the Accused Products to utilize the products in a manner that directly infringe on one or more claims of the Asserted Patents, and engaged in such inducement to promote the sales of the Accused Products (i.e. through user manuals, product support, marketing materials, technical materials, and training materials) to actively induce the end users of the Accused Products to infringe the Asserted Patents.

39.     Further, Apple has made, used, sold, offered to sell, imported and/or encouraged the making, using, selling, offering to sell, or importing of the Accused Products despite knowing of an objectively high likelihood that its actions constituted infringement of the Asserted Patents at all times relevant to this suit.

40.     As discussed above and in each Count below, Collision engaged for years in discussions with Apple that constitute notice of the Asserted Patents and Apple's infringement thereof.

41.     For the reasons described above, Apple's infringement of the Asserted Patents has been willful and egregious.

42.     Apple's acts of infringement have caused damage to Collision, and Collision is entitled to recover damages incurred as a result of Apple's wrongful acts.

## COUNT I: INFRINGEMENT OF THE '464 PATENT

43.     Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

44.     Defendant was aware of this Asserted Patent and of its infringement at least as early as their communications with Collision on or around 2015.  Throughout the next several years, and no later than 2017, Collision identified its entire patent portfolio to Apple, including the '464 patent, and provided ample details to Apple about the origin of the patents, the likely use cases and relevant techniques, and Collision's ongoing development.  Moreover, Collision even specifically identified family members of the '464 patent—like U.S. Patents 6,831,574 and 6,967,598—as particularly relevant patents to Apple's MIMO systems.  Defendant has willfully infringed the '464 patent.

45.     In the event Apple asserts that it was not aware of the '464 patent or lacked the requisite knowledge and intent to induce infringement, Apple would have been willfully blind to

Collision's patent rights. If Apple failed to review the '464 patent despite the parties' extensive meetings and communications regarding Collision's technology, patent portfolio, and materials provided by Collision, it indicates that Apple has a policy or practice of avoiding patents despite an objectively high risk of infringement.

46.    Defendant has directly infringed the '464 patent by making, using, selling, offering for sale, or importing the relevant Accused Products in the United States during the patent's term, including for testing or other purposes.  The '464 Accused Products include but are not limited to any 4G UE devices, 5G UE devices, and Wi-Fi devices used and sold in the relevant time period, which are equipped with interference cancellation technology ("Accused '464 Instrumentalities").

47.    These Accused '464 Instrumentalities practiced at least one claim of the '464 patent, as demonstrated in **Exhibit E** attached hereto (showing infringement of claim 1).

48.    Further discovery may reveal additional infringing products and/or functionalities.

49.    Defendant has also indirectly infringed the '464 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging its users to take advantage of the 4G, 5G, and Wi-Fi capabilities of the Accused '464 Instrumentalities.

50.    Plaintiff is entitled to recover damages adequate to compensate it for Defendant's infringement or at minimum a reasonable royalty.  Due to the willful nature of Apple's infringement, Collision is also entitled to enhanced damages.

51.    To the extent applicable, Collision has complied with the marking requirements set forth in 35 U.S.C. § 287.  At a minimum, Apple has known about the '464 patent for years, has been made aware by Collision of what technologies it covers, and has thus been put on notice of what techniques would infringe if implemented by Apple.  Thus, Apple has had actual notice of infringement prior to the filing of this suit.  Moreover, Collision has not distributed any patent-

12

practicing products, its only licensees prior to expiration of this patent distributed no products practicing the '464 patent, and in any case method claims do not require patent marking.

## COUNT II: INFRINGEMENT OF THE '439 PATENT

52.     Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

53.     Defendant was aware of this Asserted Patent and of its infringement at least as early as its communications with Collision on or around 2015.  Throughout the next several years, and no later than 2017, Collision identified its entire patent portfolio to Apple, including the '439 patent, and provided ample details to Apple about the origin of the patents, the likely use cases and relevant techniques, and Collision's ongoing development.  Collision even specifically identified the '439 patent and its techniques as particularly relevant to Apple's LTE and MIMO products.  Defendant has willfully infringed the '439 patent.

54.     In the event Apple asserts that it lacked the requisite knowledge and intent to induce infringement of the '439 patent, Apple would have been willfully blind to Collision's patent rights.  If Apple failed to review the '439 patent despite the parties' extensive meetings and communications regarding Collision's technology, patent portfolio, and materials provided by Collision, it indicates that Apple has a policy or practice of avoiding patents despite an objectively high risk of infringement.

55.     Defendant has directly infringed the '439 patent by, at a minimum, using and testing in the United States Accused Products that infringe the '439 patent during the patent's term, including but not limited to any 4G UE devices, 5G UE devices, and Wi-Fi devices used and sold in the relevant time period ("Accused '439 Instrumentalities").

56.     These Accused '439 Instrumentalities practiced at least one claim of the '439 patent, as demonstrated in **Exhibit F** attached hereto (showing infringement of claim 1).

57. Further discovery may reveal additional infringing products.

58. Defendant has also indirectly infringed the '439 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging its users to take advantage of the 4G, 5G, and Wi-Fi capabilities of the Accused '439 Instrumentalities.

59. Plaintiff is entitled to recover damages adequate to compensate it for Defendant's infringement or at minimum a reasonable royalty.  Due to the willful nature of Apple's infringement, Collision is also entitled to enhanced damages.

60. To the extent applicable, Collision has complied with the marking requirements set forth in 35 U.S.C. § 287.  At a minimum, Apple has known about the '439 patent for years, has been made aware by Collision of what technologies it covers, and has thus been put on notice of what techniques would infringe if implemented by Apple.  Thus, Apple has had actual notice of infringement prior to the filing of this suit.  Moreover, Collision has not distributed any patent-practicing products, and in any case method claims do not require patent marking.

### COUNT III: INFRINGEMENT OF THE '665 PATENT

61. Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

62. Defendant was aware of this Asserted Patent and of its infringement at least as early as their communications with Collision on or around 2015.  Throughout the next several years, and no later than 2017, Collision identified its entire patent portfolio to Apple, including the '665 patent, and provided ample details to Apple about the origin of the patents, the likely use cases and relevant techniques, and Collision's ongoing development.  Defendant has and currently continues to willfully infringe the '665 patent.

63. In the event Apple asserts that it was not aware of the '665 patent or lacked the requisite knowledge and intent to induce infringement, Apple would have been willfully blind to

14

Collision's patent rights. If Apple failed to review the '665 patent despite the parties' extensive meetings and communications regarding Collision's technology, patent portfolio, and materials provided by Collision, it indicates that Apple has a policy or practice of avoiding patents despite an objectively high risk of infringement.

64.    Defendant has directly infringed, and continues to directly infringe, the '665 patent by, at a minimum, using and testing in the United States Accused Products that infringe the '665 patent during the patent's term, including but not limited to any 4G UE devices and 5G UE devices used and sold in the relevant time period ("Accused '665 Instrumentalities").

65.    These Accused '665 Instrumentalities practiced at least one claim of the '665 patent, as demonstrated in **Exhibit G** attached hereto (showing infringement of claim 15).

66.    Further discovery may reveal additional infringing products.

67.    Defendant has also indirectly infringed the '665 patent by inducing infringement by others, such as end-user customers, by, for example, encouraging its users to take advantage of the 4G and 5G capabilities of the Accused Products.

68.    Defendant's continued infringement of the '665 patent has damaged and will continue to damage Plaintiff.

69.    Plaintiff is entitled to recover damages adequate to compensate it for Defendant's infringement or at minimum a reasonable royalty.  Due to the willful nature of Apple's infringement, Collision is also entitled to enhanced damages.

70.    To the extent applicable, Collision has complied with the marking requirements set forth in 35 U.S.C. § 287.  At a minimum, Apple has known about the '665 patent for years, has been made aware by Collision of what technologies it covers, and has thus been put on notice of what techniques would infringe if implemented by Apple.  Thus, Apple has had actual notice of

15

infringement prior to the filing of this suit.  Moreover, Collision has not distributed any patent-practicing products, and in any case method claims do not require patent marking.

### COUNT IV: INFRINGEMENT OF THE '190 PATENT

71.   Plaintiff incorporates the allegations of all of the foregoing paragraphs as if fully restated herein.

72.   Defendant was aware of this Asserted Patent and of its infringement at least as early as its issuance, pursuant to the parties' communications with Collision that began on or around 2015.  Throughout the next several years, and no later than 2019, Collision identified its entire patent portfolio to Apple, including the '190 patent, and provided ample details to Apple about the origin of the patents, the likely use cases and relevant techniques, and Collision's ongoing development.  Defendant has willfully infringed the '190 patent.

73.   In the event Apple asserts that it was not aware of the '190 patent or lacked the requisite knowledge and intent to induce infringement, Apple would have been willfully blind to Collision's patent rights. If Apple failed to review the '190 patent despite the parties' extensive meetings and communications regarding Collision's technology, patent portfolio, and materials provided by Collision, it indicates that Apple has a policy or practice of avoiding patents despite an objectively high risk of infringement.

74.   Defendant has directly infringed the '190 patent by making, using, selling, offering for sale, and/or importing into the United States products that infringe the '190 Patent, including but not limited to Accused Products that have cellular and Wi-Fi functionality and support Wi-Fi Assist or MPTCP functionality in iOS 13 or later ("Accused '190 Instrumentalities").

75.   These Accused '190 Instrumentalities practice at least one claim of the '190 patent, as demonstrated in **Exhibit H** attached hereto (showing infringement of claim 14).

76.   Further discovery may reveal additional infringing products.

77. Defendant has also indirectly infringed the '190 Patent by inducing infringement by others, such as end-user customers, by, for example, encouraging its users to take advantage of the Wi-Fi Assist and MPTCP features (or MPTCP-compatible apps) in iOS 13 or later, implicating the accused capabilities of the Accused '190 Instrumentalities.

78. Plaintiff is entitled to recover damages adequate to compensate it for Defendant's infringement or at minimum a reasonable royalty. Plaintiff is also entitled to equitable and injunctive relief (with injunctive relief limited to the patent term). Due to the willful nature of Apple's infringement, Collision is also entitled to enhanced damages.

79. To the extent applicable, Collision has complied with the marking requirements set forth in 35 U.S.C. § 287. At a minimum, Apple has known about the '190 patent for years, has been made aware by Collision of what technologies it covers, and has thus been put on notice of what techniques would infringe if implemented by Apple. Moreover, Collision has not distributed any patent-practicing products, and in any case method claims do not require patent marking.

## **PRAYER FOR RELIEF**

80. WHEREFORE, Plaintiff respectfully requests the following relief:

   a. a judgment in favor of Plaintiff that Defendant has infringed, either literally and/or under the doctrine of equivalents, at least one claim of each of the Asserted Patents;

   b. a judgment that Defendant's infringement has been and is willful;

   c. a judgment and order requiring Defendant to pay Plaintiff its damages, costs, expenses, and any enhanced damages to which Plaintiff is entitled for Defendant's infringement;

   d. a judgment and order requiring Defendant to provide an accounting and to pay supplemental damages to Plaintiff, including without limitation, pre-judgment and post-judgment interest;

e.  a judgment and order permanently enjoining Defendant and any of its officers, directors, agents, servants, subsidiaries, affiliates, divisions, branches, parents, and/or those in association with them from further infringing the '190 patent during the duration of its patent term;

f.  a judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding Plaintiff its reasonable attorney fees against Defendant; and

g.  any and all other relief as the Court may deem appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

81.  Pursuant to Fed. R. Civ. P. 38, Plaintiff hereby demands trial by jury on all claims and issues so triable.

DATED: July 20, 2026

Respectfully submitted,

*/s/ Bradley W. Caldwell*
Bradley W. Caldwell (TX Bar No. 24040630)
bcaldwell@caldwellcc.com
J. Austin Curry (TX Bar No. 24059636)
acurry@caldwellcc.com
Justin T. Nemunaitis (TX Bar No. 24065815)
jnemunaitis@caldwellcc.com
Christopher S. Stewart
(TX Bar No. 24079399)
cstewart@caldwellcc.com
John F. Summers (TX Bar No. 24079417)
jsummers@caldwellcc.com
Seth R. Reich (TX Bar No. 24088283)
sreich@caldwellcc.com
Aisha Mahmood Haley
(TX Bar No. 24139895)
ahaley@caldwellcc.com
**CALDWELL CASSADY & CURRY P.C.**
2121 N Pearl Street, Suite 1200
Dallas, Texas 75201
Telephone: (214) 888-4848
Facsimile: (214) 888-4849

Mark D. Siegmund
Texas Bar No. 24117055
**CHERRY JOHNSON SIEGMUND
JAMES PC**
Bridgeview Center
7901 Fish Pond Road, 2nd Floor
Waco, Texas 76710
Telephone: (254) 732-2242
Facsimile: (866) 627-3509
msiegmund@cjsjlaw.com

**ATTORNEYS FOR PLAINTIFF
COLLISION COMMUNICATIONS, INC.**